# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS CALVEY, | ) | CASE NO. 1:19 CV 936 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| | ) | |
| STIFEL, NICOLAUS & COMPANY, | ) | **MEMORANDUM OPINION** |
| INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, Stifel, Nicolaus & Company, Incorporated (Docket #11).

I.  **Factual and Procedural Background.**[1]

    A.  **Plaintiff's Investment Accounts.**

In 2012, Plaintiff, Thomas Calvey, opened three investment accounts (a Traditional Individual Retirement Account, a Roth Individual Retirement Account, and a Transfer on Death ("TOD") Brokerage Account), totaling over $800,000.00, with Stifel, Nicolaus & Company,

---

[1] The facts as stated in this Memorandum Opinion and Order are taken from the Parties' submissions. Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving Party.

Incorporated ("Stifel"). His Financial Advisor at Stifel was Theodora Braver.[2] Meekie Shiflett was the Sales Associate who assisted Ms. Braver and processed paperwork for Ms. Braver's clients. Ms. Braver and Ms. Shiflett worked out of a Stifel office in Maryland and communicated with Plaintiff primarily via telephone. (Deposition of Theodora Braver at p. 45.) Plaintiff lived in various locations throughout the United States over the course of their dealings and would notify Ms. Braver or Ms. Shiflett when his address changed. (Braver Depo. at p. 60.)

### B. Plaintiff's Diagnosis and Communication with Stifel.

In approximately 2014, Plaintiff was diagnosed with pancreatic cancer. Ms. Braver and others at Stifel were aware of Plaintiff's diagnosis and that Plaintiff would be undergoing treatment. Ms. Braver testified at her deposition that she was "horror-stricken" when she heard the news. Plaintiff called Ms. Braver from his hospital bed in January 2015 to discuss his condition. Ms. Braver's notes from January 9, 2015, indicate that she needed to change Plaintiff's address to the hospital where he had been since June. Plaintiff and Ms. Braver discussed making several changes to his investments, as well as changing the beneficiaries on his Accounts to designate his aunt as the primary beneficiary, with his mother contingent.

There was minimal communication between Plaintiff and anyone at Stifel regarding his condition thereafter. On July 29, 2015, Plaintiff contacted Branch Operations Manager Vivian Wilhelm, notifying her of a change of address. Ms. Wilhelm forwarded the information to Ms.

---

[2] Ms. Braver had been Plaintiff's financial advisor since approximately 2006; had previously worked for Wells Fargo/Wachovia; and, when Ms. Braver left Wells Fargo/Wachovia for Stifel, Plaintiff moved his Accounts to Stifel. Ms. Braver and Plaintiff had a good business relationship and they engaged in friendly conversation when they spoke.

-2-

Shiflett. (Docket #30-10.) In an email to Ms. Shiflett, Ms. Wilhelm stated, "He called to change his address, he is now in a step down rehab unit." (Docket #30-10.) Ms. Shiflett passed that information on to Ms. Braver. Plaintiff states that in 2015, many individuals at Stifel knew he was not doing well.

Ms. Braver spoke to Plaintiff on February 25, 2016 regarding his Accounts. In her notes, Ms. Braver commented that Plaintiff's health had improved. (Docket #30-15.) As discussed in her deposition, Ms. Braver attempted to contact Plaintiff on several occasions thereafter in 2016 regarding action that needed to be taken on his Accounts – both calling and emailing him – but received no response. Ms. Braver's notes from December 27, 2016 indicate that she had spoken to Plaintiff and would be taking certain actions with regard to his Accounts. (Docket #30-15.) Plaintiff states that from 2016 to May 2017, nothing out of the ordinary occurred with regard to his Accounts, and that he never contacted Ms. Braver to indicate that he was seriously ill or otherwise incapacitated.

### C. Stifel Receives a Power of Attorney.

On May 3, 2017, Ms. Shiflett emailed Ms. Wilhelm, stating as follows with regard to Plaintiff's Accounts:

> I received a call last week from [Plaintiff's] aunt who is beneficiary on the accounts. She said he was not doing well but, this has happen [sic] before (getting ill then getting well again). She wanted to confirm that she and Mr. Calvey's mother were still beneficiaries on the account's [sic] (they are on all accounts).[3] Mr. Calvey's brother called yesterday in the later [sic] part of the day

---

3

    Ms. Braver testified during deposition that it was unusual for someone other than an account holder or someone with a power of attorney to call for information on an account, and testified during deposition that Stifel would not release any information to someone who was not an account holder or POA. (Braver Depo at. pp. 102-03.)

-3-

wanting to know if he can take paperwork (POA) to the OH office, I told him yes.
The OH office had emailed the POA to this office and I printed them out. I
looked at the signatures to make sure they matched and I don't think they look the
same. I wanted to know if you knew the brother or your relationship with the
client?

(Docket #30-11.) Ms. Shiflett asked for approval to send this information to the Branch Manager, Stephen Mitchell. Ms. Wilhelm suggested she send it to Mr. Mitchell and Shelley Cole, another Financial Advisor in the office.

The Power of Attorney ("POA"), dated April 10, 2017, designated Plaintiff's brother, James Calvey, as attorney-in-fact for all three of Plaintiff's Accounts at Stifel. The POA, which had been hand-delivered by James Calvey to an Ohio Stifel Branch before being forwarded to Ms. Braver's office in Maryland, authorized James Calvey to "[c]onduct any business with any banking or financial institution with respect to any of [Plaintiff's] accounts, including, but not limited to, making deposits and withdrawals . . ." The POA included the following language:

> 13. Notice to Third Parties
>
> Any third party who receives a valid copy of this Power of Attorney can rely on and act under it. A third party who relies on the reasonable representations of my Attorney-in-fact as to a matter relating to a power granted by this Power of Attorney will not incur any liability to the Principal or to the Principal's heirs, assigns, or estate as a result of permitting the Attorney-in-fact to exercise the authority granted by this Power of Attorney up to the point of revocation of this Power of Attorney.
>
> * * *
>
> 15. Acknowledgement
>
> I, Thomas Calvey, being the Principal named in this Durable Power of Attorney hereby acknowledge:

a. I have read and understand the nature and effect of this Durable Power of Attorney;

b. I recognize that this document gives my attorney-in-fact broad powers over my assets, and that these powers will continue past the point of my incapacity;

c. I am of legal age in the State of Ohio to grant a Durable Power of Attorney; and

d. I am voluntarily giving this Durable Power of Attorney and recognize that the powers given in this document will become effective [on April 10, 2017].

(Id.)

The POA Form was executed in Parma, Ohio and contains a Notary Acknowledgment, through which Joseph Wild, a Notary Public, acknowledged that Plaintiff signed the POA Form as his own free act. Stifel attached the Affidavit of Mr. Wild to its Reply Brief. (Docket #32-1.) Mr. Wild states in his Affidavit that on April 10, 2017, at the request of James Calvey, he met with Thomas Calvey in Parma, Ohio at a health care facility. Mr. Wild states that he checked Thomas Calvey's identification and that Thomas Calvey presented him with a Durable Power of Attorney for Financial Management, appointing his brother James as his attorney-in-fact over his financial affairs. Mr. Wild states that he spoke with Thomas, who appeared to be of sound mind and free from undue influence or coercion, and that Thomas confirmed that he understood the POA Form and that it was his intent to appoint his brother James as his attorney-in-fact. Mr. Wild states he witnessed Thomas sign the POA Form and acknowledged his signature and affixed his notary seal, and that he also witnessed and acknowledged the Witness Certificate of Edda Nafziger attached to the POA Form.

The POA Form also contains a Witness Certificate, through which a witness, Edda Nafziger, acknowledged as follows:

> 1. I witnessed the signing of the Power of Attorney of Thomas J Calvey dated this 10th day of April, 2017.
> 2. I am an adult with capacity to witness the signing of the Power of Attorney and I am the subscribing witness thereto.
> 3. In my opinion, Thomas J Calvey had the capacity to understand the nature and effect of the Power of Attorney at the time the Power of Attorney was signed and the Principal signed it freely and voluntarily without any compulsion or influence from any person.

(Id.)

Ms. Shiflett notified Ms. Braver of her concerns regarding Plaintiff's signature. Ms. Braver testified during deposition that she looked at the signed, witnessed and notarized POA and, that although the signature looked "shaky," she thought the POA looked "fine." (Braver Depo. at pp. 106-07.) Ms. Shiflett also emailed Mr. Mitchell, indicating that she did not believe the signature on the POA matched Plaintiff's signature on previously executed documents, attaching the POA along with examples of past signatures for his review. (Docket #30-12.) Mr. Mitchell testified that it is not his job to compare signatures on documents and that he did not remember if he reviewed any of the documents when they were forwarded to him by Ms. Shiflett. Mr. Mitchell forwarded the documents to Ms. Wilhelm because it would have been Ms. Wilhelm's responsibility to forward the documents to the Stifel New Accounts Group in St. Louis, Missouri for review and approval.

Ms. Wilhelm testified that she looked at the fact that the POA was notarized and witnessed and, that although she is not a "handwriting specialist," she did not "see much difference in anything." (Deposition of Vivian Wilhelm at p. 22.) Ms. Wilhelm forwarded the POA documents to the New Accounts Group. (Wilhelm Depo. at pp. 23-42.) There is no evidence that Ms. Shiflett's concerns regarding the signature were relayed to the New Accounts Group. Jeffrey Primiano, in-house counsel for Stifel, testified during his deposition that the New

Accounts Group is responsible for reviewing powers of attorney and determining whether powers of attorney are properly executed. (Deposition of Jeffrey Primiano, Docket #28-1 at pp. 28 and 54-55.) Mr. Primiano testified that it was not Ms. Shiflett's job as a Sales Assistant to check signatures. (Docket #28-1 at pp. 60-62.) Nancy Mooney, the New Accounts Manager, and her employee, Stephanie Mareth, reviewed the POA Form and the New Accounts Group approved the POA on May 16, 2017, adding James Calvey to Plaintiff's Accounts as having the powers of attorney as expressly set forth therein.[4]

### D. Communications with James Calvey.

On May 16, 2017, James Calvey called Ms. Braver and informed her that Plaintiff's cancer had worsened; that Plaintiff had recently undergone surgery; and, that Plaintiff was living in a hospice care facility. Ms. Braver's notes from that phone call read as follows:

> New phone at the house is 216-862-0264. TJ has been at his other brothers house, that he is not on good terms with. He is now in hospice. Presented POA paperwork naming brother Jim. TJ's beneficiaries had been: aunt as primary and his mother as contingent. Now that his favored brother Jim is no longer ill, TJ wants his mom to be the primary beneficiary (had not wanted his other evil brother to receive any of this money after his mother died), so he had named his aunt. Now he wants to reverse that, naming his mom as primary and aunt as contingent. In addition his aunt is comfortable financially and does not want the inheritance. I would feel more comfortable hearing this from TJ and have asked Jim to let me speak with him when he is able to speak. Jim, as POA is able according to his doc to change beneficiaries on insurance and IRA accounts. Not sure about the TOD account. So if TJ is able to do it, that would be preferable.
>
> TJ would also like $300k to buy a house, so that if he recovers he does not have

---

[4] Plaintiff argues that the Stifel New Accounts Group should have noticed that a page was "missing" from the faxed POA. There is nothing in the record regarding what was written on the missing page, if anything. Plaintiff asserts that the failure of anyone at Stifel to acknowledge that a page was missing from the faxed POA is evidence of negligence.

-7-

> to live with his other brother. Also they met [sic] set up a 4% distribution from the remaining $500,000, to be payable to TJ to be deposited by ach to a joint account he has will his mother.

(Docket #30-15.)

Ms. Braver emailed Ms. Shiflett that same day, stating as follows:

> Thomas j calvey has 3 accts. Please delete the old phone number. The correct phone number is 216-862-0264.
>
> Also has the POA gone through on the accounts? Has it been accepted? Can he change his beneficiaries on his iras and his to [sic] account? He has his aunt listed as the primary beneficiary, and his mother as the contingent beneficiary. He would like to have that reversed, naming his mother as primary and his aunt as contingent. Please send out completed paperwork with those changes. Also send out another set of blank docs. in case, he changes his mind. Bear in mind, this is for all 3 accounts.

(Docket #30-13.) Ms. Shiflett confirmed that "the POA went through and is coded on the accounts. Even though James is POA, Thomas can change beneficiaries on his accounts. I will get the forms out today." (Id.)

On May 16, 2017, Ms. Shiflett emailed Ms. Braver to inform her that Plaintiff's aunt had called with some questions and had indicated that Mr. Calvey was in hospice. On May 17, 2017, Ms. Braver responded that she had spoken to Plaintiff's aunt. (Docket #30-14.)

On May 22, 2017, Ms. Shiflett emailed Ms. Braver, stating, "I spoke with James Calvey this morning and he told me he spoke with you about needing $312,000 by May 30th. He also mentioned that he will need a 4% living expense." Ms. Braver responded the next day, "No. He said they were thinking of buying house. He did not say that he needed money by May 30. Interesting." (Docket #30-16.) In subsequent emails, Ms. Shiflett indicated that James Calvey was "faxing in a fed wire form" and indicated that Ms. Braver needed to "speak with him about

-8-

generating cash in the account for the amount of $312,000.00."

Ms. Braver's notes from May 25, 2017, read as follows:

> spoke with Jim. They are settling on a house. They will need $313,000 to
> purchase home for cash. I discussed the positions to be liquidated. The realized
> gains should be approx $8000. Tom currently collects $1830 monthly from social
> security disability. That combined with his investment income of $22,800 is
> appro. $45,000. The $8000 capital gain would be in addition. I suggested they
> get an accountant, to pay estimated quarterly taxes. Of course, with liquidation of
> around $335k of account, the income will drop significantly. I suggested a 4%
> distribution on the remaining $229k, or $760 per month. Asked meekie to send
> out paperwork to send that amount to the linked checking acct monthly beginning
> on June 15. Liquidated enough in account to provide the $312k plus the $9k in
> monthly distributions for the next year, and approx. 3k in management fees. Held
> on to the positions with the largest gains to potentially avoid the capital gains tax.

(Docket #30-15.)

On May 26, 2017, James Calvey, as POA, withdrew $312,000.00 from Plaintiff's TOD Account and the money was electronically transferred by Stifel into the bank account of Leona Calvey, as requested. Stifel's internal procedures require verbal authorization for such a large transfer. Mr. Mitchell testified that although he does not remember receiving verbal confirmation, the money would not have been transferred absent verbal confirmation. James Calvey also established monthly distributions of approximately $760 per month, represented to be for the purpose of covering Plaintiff's monthly expenses. On or about June 16, 2017, James Calvey purchased the residence located at 18749 Alexander Drive, Walton, Hills, Ohio for a purchase price of $273,500.00. The residence was titled to James and Leona Fay Calvey. On or about November 3, 2017, James Calvey called Ms. Braver and, as POA, withdrew $36,000.00 from the TOD Account, representing that the money was going to be used to purchase a wheelchair van for transporting Plaintiff. In total, James Calvey withdrew $361,680.00 from

Plaintiff's Stifel TOD Account.

### E. Plaintiff Recovers and Denies Naming Brother as POA.

On or about May 31, 2018, Plaintiff called Ms. Braver and informed her that he had survived pancreatic cancer. He revoked the POA. He told Ms. Braver that the (1) had never named his brother Power of Attorney; (2) that he had no house in his name; (3) that there was no wheelchair van; and, (4) that he wanted his money returned. Stifel refused to refund the money withdrawn by James Calvey as POA.

### F. Plaintiff's Complaint Against James and Leona Calvey.

On October 2, 2018, Plaintiff filed a Complaint in the Cuyahoga County, Ohio Court of Common Pleas, Case No. CV 18 904721, against James and Leona Fay Calvey, asserting claims for Unjust Enrichment, Quiet Title, Conversion/Civil Theft, Replevin, Fraud, Breach of Fiduciary Duty, and Forcible Entry and Detainer. In his Complaint against James and Leona Calvey, Plaintiff claims that he was "duped into executing a Power of Attorney for Financial Management which named J. Calvey as Plaintiff's fiduciary." (Complaint in Case No. CV 18 904721, Paragraph 8.) On July 2, 2019, the Common Pleas Court held that Plaintiff is the sole owner of the home purchased by James Calvey and that Plaintiff is entitled to possession of the residence. The remaining issues in the State Court Case are set for trial on March 2, 2020.

### G. Plaintiff's Complaint Against Stifel.

On April 2, 2019, Plaintiff filed a Complaint against Stifel in the Cuyahoga County Court of Common Pleas, Case No. CV 19 913337, asserting claims for Negligence, Breach of Fiduciary Duty, Conversion, and Punitive Damages. On April 25, 2019, Stifel removed the case to this Court. Plaintiff alleges that Stifel failed to properly verify the POA; failed to properly

verify other documents; and, failed to properly verify and process withdrawals of his money. Plaintiff states Stifel was provided with a POA that "was allegedly signed by the Plaintiff." (Complaint at Paragraph 7.) Plaintiff states in his Declaration that James Calvey "forged [his] name and had his friends witness the document (in which he named himself as my attorney-in-fact)." In briefing, Plaintiff states, "The Defendant knew as early as May 3, 2017 that the signature of its client was not the signature on the POA." (Docket #30 at p. 18.)

**II.     Stifel's Motion for Summary Judgment.**

Stifel filed a Motion for Summary Judgment on September 30, 2019. (Docket #11.) Stifel argues that it acted in accordance with the terms of the signed and notarized POA Form, thereby defeating all of Plaintiff's claims, and that Plaintiff has otherwise failed to present evidence sufficient to defeat summary judgment.

On December 16, 2019, Plaintiff filed his Brief in Opposition. (Docket #30.) Plaintiff argues that "the issues in this case go beyond a Power of Attorney 'with two witnesses and a notary,'" asserting that this case is "about clear negligence and breach of fiduciary duty." Plaintiff argues that Stifel was negligent and that it breached a fiduciary duty owed to Plaintiff "when it allowed over $360,000.00 to be disbursed/wired from Plaintiff's account." Plaintiff argues that Ms. Shiflett's questions regarding the signature on the POA should have been investigated further because she was the person at Stifel most familiar with his signature; that Plaintiff was a conservative investor and that Stifel should have questioned James Calvey's withdrawals from his account; that Stifel should have questioned whether Plaintiff actually signed the Power of Attorney because it had been informed Plaintiff was in hospice; that Stifel should have questioned the Power of Attorney because no one at Stifel knew of James Calvey

-11-

prior to receiving the Power of Attorney; that Stifel did not acknowledge a missing page in the Power of Attorney documents it reviewed; and, that Stifel failed to get verbal authorization before transferring Plaintiff's funds into the bank account designated for deposit by James Calvey.

Stifel filed a Reply Brief on December 23, 2019. (Docket #32.) Stifel attaches the Affidavit of Joseph Wild, the Notary Public, who states that the POA was properly executed. (Docket #32-1.) Stifel attaches the excerpts from the deposition of Jeffrey Primiano, its in-house Counsel, who testified that it was not Ms. Shiflett's job to check signatures on a POA and that the POA was sent to the New Accounts Group that is trained in, and responsible for, reviewing powers of attorney. (Docket #32-2.) Citing its Answers to Interrogatories (Docket #31-36), Stifel states that the POA was reviewed by Nancy Mooney, the New Accounts Manager, and her employee, Stephanie Mareth; that a POA Checklist (Docket #31-32) was completed; and, that once the POA was approved, James Calvey was added to the Accounts. Stifel argues that even if a page was missing from the POA documents that were faxed, the POA was valid under Ohio law because it was executed before a Notary Public. Finally, Stifel states that additional arguments raised by Plaintiff are without merit; that Mr. Mitchell testified that although he did not remember the specific conversations, he would have received a verbal confirmation from James Calvey prior to transferring funds; and, that Plaintiff relies on misinterpretations of the timestamps on multiple documents produced during discovery in arguing that the wire transfer somehow was improper. (See Declaration of Matthew Linehan (Docket #32-3) and Affidavit of Stephen Mitchell (Docket #32-5).)

### III. Plaintiff's Motion to Strike.

Plaintiff filed a Motion to Strike on December 28, 2019. (Docket #33.) Plaintiff argues that the Court should strike the Affidavit of Notary Public Joseph Wild, alleging that Stifel failed to identify him or provide his contact information during discovery. Plaintiff also asks the Court to strike the Affidavit of Stephen Mitchell and Declaration Matthew Linehan, arguing that Stifel is attempting to provide self-serving testimony, contradictory testimony and/or attempting to introduce information which was not properly disclosed during discovery.

On January 8, 2020, Stifel filed its Brief in Opposition to Plaintiff's Motion to Strike. (Docket #37.) Stifel explains that it provided Mr. Wild's Affidavit to Plaintiff's Counsel on October 22, 2019 – during discovery and nearly two months before Plaintiff filed his Opposition to Stifel's Motion for Summary Judgment. Stifel states that Counsel for Plaintiff never asked Stifel for Mr. Wild's contact information, which Stifel's Counsel found through a routine internet-based search. Stifel also notes that it had previously identified Mr. Wild in its initial disclosures on July 9, 2019. Further, Stifel argues that Plaintiff misrepresents Stephen Mitchell's deposition testimony and that Mr. Mitchell's Affidavit confirms his earlier deposition testimony indicating that he received verbal approval for the wire transfer of funds to purchase the home. Finally, Stifel argues that Plaintiff's concerns regarding the Declaration of Matthew Linehan are the result of Counsel for Plaintiff's inability to understand the format of Stifel's email production to Counsel, despite Stifel's attempts to explain the same. Plaintiff did not file a Reply Brief.

The Court has reviewed all information relevant to Plaintiff's Motion to Strike. The Affidavits and Declaration are facially proper and comport with Fed. R. Civ. P. 56(c)(4), which

provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." The record fails to support the arguments raised by Plaintiff in his Motion to Strike and the Court finds the Motion to Strike to be without merit. Accordingly, Plaintiff's Motion to Strike (Docket #33) is hereby DENIED.

**IV.     Standard of Review.**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

V.     **Discussion.**

   A.     **Negligence and Breach of Fiduciary Duty.**

In Ohio, a claim for common law negligence requires evidence that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; and, (3) the breach proximately caused the plaintiff's injury or damages. *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 697 N.E.2d 198 (1988). A defendant breaches its duty of care to a plaintiff when the defendant fails to exercise the degree of care that an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. *Mussivand v. David*, 45 Ohio St. 3d 314, 544 N.E.2d 265 (1989). A defendant's negligence is the proximate case of injury if the injury is the natural and probable consequence of the defendant's negligent act, and if the defendant should have foreseen the injury in light of the circumstances. *Id.*

Similarly, the elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) injury proximately caused by the breach. *Garvais v. Reliant Inventory Solutions, Inc.*, Case No. 2:09 CV 389, 2012 U.S. Dist. LEXIS 131558, at *15 (S.D. Ohio Sept. 14, 2012). "A fiduciary has been defined as a person having a duty, created by his or her undertaking, to act primarily for the benefit of another in matters connected with such undertaking." *All Star Land Title Agency, Inc. v. Surewin Inv., Inc.*, Case No. 87569, 2006 Ohio 5729, 2006 Ohio App. LEXIS 5727, at P 36 (8th Dist. Nov. 2, 2006). "A

claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care." *Id.*

Stifel processed James Calvey's requested withdrawals from Plaintiff's account because James Calvey was designated as attorney-in-fact over Plaintiff's finances in the notarized POA. In Ohio, a power of attorney is valid if its execution complies with Section 1337.25 of the Revised Code. Ohio Rev. Code § 1337.26(A). Section 1337.25 provides as follows:

> A power of attorney must be signed by the principal or in the principal's conscious presence by another individual directed by the principal to sign the principal's name on the power of attorney. A signature on a power of attorney is presumed to be genuine if the principal acknowledges the signature before a notary public or other individual authorized by law to take acknowledgments.

A bank receiving a valid power of attorney has no duty to investigate every action that the holder of that power of attorney takes to ensure that each action is proper. *See Empire Trust Co. v. Cahan*, 274 U.S. 473, 479 (1927); *Gupta v. Lincoln Natl. Life Ins. Co.*, No. 05AP-378, 2005 WL 3304019, at *4 (Ohio App. 10th Dist. Dec. 6, 2005) (unpublished opinion) (holding that to impose such a duty "would not only be impracticable, but would essentially eliminate the power of attorney as a useful tool in the transaction of business of any elderly, disabled, absent, or otherwise.")

The New Accounts Group at Stifel reviewed and approved the notarized and witnessed POA and, thereafter, James Calvey was authorized to act as Plaintiff's attorney-in-fact and withdraw funds from Plaintiff's account. There is no evidence to suggest Stifel had any reason to challenge or question whether the POA was lawfully notarized and, aside from Plaintiff's self-serving statements, there is no evidence that Stifel failed to properly verify the POA through its standard procedures. Absent evidence that Stifel knew or suspected that the notary had

improperly acknowledged the signatures on the POA,[5] there is no genuine issue of material fact as to whether Stifel was negligent or breached a duty of care in accepting the POA and acting in accordance with its terms.

Plaintiff argues Stifel employees should have, for various reasons, investigated his personal circumstances more thoroughly after receiving the POA and before allowing the withdrawal of money from his account, and that Stifel was negligent or breached a fiduciary duty in not doing so. The Court has read each of the deposition transcripts in this case in its entirety – noting that there are instances in which Plaintiff takes testimony out of context to paint a picture that Stifel's actions with regard to his account fell below the required standard of care. The Court has thoroughly reviewed all of the evidence offered of record and, construing conflicting evidence in a light most favorable to Plaintiff, there is nothing in the record sufficient to establish that Stifel failed to exercise the degree of care that an ordinarily reasonable and prudent person would exercise under the same or similar circumstances, or failed to exercise the degree of care that would be necessary even if a fiduciary relationship is assumed, in relation to his Accounts.

Ms. Braver and other Stifel employees were aware of Plaintiff's battle with pancreatic

---

[5] As set forth above, Plaintiff states in his Declaration that James Calvey "forged [his] name and had his friends witness the document (in which he named himself as my attorney-in-fact)" and states in briefing that "The Defendant knew as early as May 3, 2017 that the signature of its client was not the signature on the POA." (Docket #30-1 at Paragraph 8; Docket #30 at p. 18.) This contradicts the allegations Plaintiff makes in his State Court case against James and Leona Calvey, in which he claims he was "duped into signing" the POA. Aside from Plaintiff's contradictory and self-serving statements, there is no evidence that the POA was not validly executed. The Notary Public, Mr. Wild, attests to the fact that Mr. Calvey knowingly and willingly signed the POA in his presence.

cancer; Ms. Braver spoke to James Calvey – Plaintiff's brother and attorney-in-fact for financial matters as designated on the POA – who indicated that he needed money from Plaintiff's account for Plaintiff's care; and, Stifel complied with the terms of a signed, notarized and witnessed Power of Attorney when processing the withdrawal requests. The damages alleged by Plaintiff are attributable to the alleged misconduct of James Calvey, and were not proximately caused by Stifel. Furthermore, the evidence of record does not support Plaintiff's claims that there were deficiencies in the POA approval process or irregularities in the processing of the withdrawals which were the proximate cause of any of the damages alleged by Plaintiff.

For the foregoing reasons, Stifel is entitled to summary judgment as to Plaintiff's negligence and breach of fiduciary duty claims.

**B.     Conversion.**

A claim for conversion requires "(1) plaintiff's ownership or right to possess the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of [p]laintiff's property; and (3) damages." *Kuvedina, LLC v. Cognizant Tech. Solutions*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013). As set forth above, Stifel acted lawfully in transferring funds from the account in accordance with the terms of the POA and there is otherwise no evidence to support a claim of conversion against Stifel. Accordingly, Stifel is entitled to summary judgment as to Plaintiff's conversion claim.

**C.     Punitive Damages.**

"In Ohio, punitive damages are not an independent cause of action, but are, when appropriate, "awarded as a mere incident of the cause of action in which they are sought.'"

*Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09 CV 01575, 2010 U.S. Dist. LEXIS 19405 (N.D. Ohio Mar. 4, 2010) (citing *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 650, 635 N.E.2d 331 (1994); *Bishop v. Grdina*, 20 Ohio St. 3d 26, 28, 20 Ohio B. 213, 485 N.E.2d 704 (1985) ("No civil cause of action in this state may be maintained simply for punitive damages.").) Accordingly, Stifel is entitled to summary judgment as to Plaintiff's punitive damages claim.

## VI. Conclusion.

Plaintiff's Motion to Strike (Docket #33) is hereby DENIED.

The Motion for Summary Judgment filed by Stifel, Nicolaus & Company, Inc. (Docket #11) is hereby GRANTED.

This case is hereby terminated.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
Senior United States District Judge

DATED: February 14, 2020